UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NICHOLAS STEINBRECHER,

               Plaintiff,

    vs.

KENVUE, INC., KIRK L. PERRY, LARRY
MERLO, RICHARD E. ALLISON JR,
SEEMANTINI GODBOLE, MELANIE L.
HEALEY, SARAH HOFSTETTER, BETSY D.
HOLDEN, ERICA MANN, KATHLEEN
PAWLUS, VASANT PRABHU, JEFF SMITH,
MICHAEL E. SNEED

               Defendants.

Case No. 25-cv-1923

---

## COMPLAINT

---

Plaintiff Nicholas Steinbrecher ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Kenvue, Inc. ("Kenvue" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Kenvue, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed

acquisition of Kenvue by Kimberly-Clark Corporation ("Parent") and Parent's newly formed merger subsidiaries (together with Parent, "Kimberly-Clark").

2.     On or about November 3, 2025, Kenvue entered into an agreement and plan of merger (the "Merger Agreement"), whereby Kimberly-Clark will acquire Kenvue (the "Proposed Transaction") and shareholders of Kenvue common stock will receive, in exchange for each share of Kenvue common stock they own, 0.14625 shares of Kimberly-Clark common stock for each share of Kenvue common stock they own (the "Exchange Ratio") and $3.50 in cash (the "Cash Consideration" and, together with the Exchange Ratio, the "Merger Consideration").

3.     On or about December 4, 2025, in order to convince Kenvue's shareholders to support the Proposed Transaction, the Board authorized the filing of a Form S-4 Registration Statement (the "Registration Statement") with the Securities and Exchange Commission ("SEC"). As detailed below, the Registration Statement is materially incomplete and misleading with respect to the financial impacts of the Proposed Transaction on the combined company and the financial fairness of the Proposed Transaction.

4.     The special meeting at which Kenvue shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") will be scheduled and the definitive proxy statement that will be used to solicit votes on the Proposed Transaction will be sent to Kenvue shareholders shortly.  It is imperative that the material information that has been omitted from the Registration Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented and make a fully and fairly informed determination as to how to vote.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction, unless and until the material information

discussed below is disclosed to Kenvue's shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2). A significant portion of events occurred in this District because Kimberly-Clark's 401(k) and Profit-Sharing Plan for the benefit of and attributable to its named executive officers is located within this District. *Santore v. Swaminathan*, No. 17 cv 5742, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, No 94 c 1461, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. &*

*Sanitation Emples. Ret. Trust v. Casey*, No. 22-cv-2371, 2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more permissive than under 28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants were aware that the Registration Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## PARTIES

9.    Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Kenvue common stock.

10.    Defendant Kenvue is a publicly traded company that focuses on the development and marketing of consumer health products like Listerine, Neutrogena, and Tylenol. Kenvue's common stock trades on the Nasdaq Stock Market (the "Nasdaq") under the ticker symbol "KVUE."

4

11.     Defendant Kirk L. Perry ("Perry") is Kenvue's Interim Chief Executive Officer and a director of the Company.

12.     Defendant Larry Merlo ("Merlo") is the Chairman of the Board of Directors of the Company.

13.     Defendant Richard E. Allison, Jr. ("Allison") is a director of the Company.

14.     Defendant Seemantini Godbole ("Godbole") is a director of the Company.

15.     Defendant Melanie L. Healey ("Healey") is a director of the Company.

16.     Defendant Sarah Hofstetter ("Hofstetter") is a director of the Company.

17.     Defendant Betsy D. Holden ("Holden") is a director of the Company.

18.     Defendant Erica Mann ("Mann") is a director of the Company.

19.     Defendant Kathleen Pawlus ("Pawlus") is a director of the Company.

20.     Defendant Vasant Prabhu ("Prabhu") is a director of the Company.

21.     Defendant Jeff Smith ("Smith") is a director of the Company.

22.     Defendant Michael E. Sneed ("Sneed") is a director of the Company.

23.     The defendants identified in paragraphs 11 through 22 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Proposed Transaction

24.     In April 2024, Kimberly-Clark and representative of J.P. Morgan Securities LLC ("J.P. Morgan") engaged in preliminary discussions regarding potential strategic options, including a potential business combination between Kimberly-Clark and Kenvue.

25.     In March 2025, representatives from Kimberly-Clark continued their endeavors to seek a business combination with Kenvue, discussing a potential business combination with

5

Kenvue with PJT Partners LP ("PJT Partners").

26. One June 17 and 18, 2025, at a regularly scheduled quarterly meeting by the Kimberly-Clark board of directors, the Kimberly-Clark board agreed that Kimberly-Clark's senior management contact Kenvue's board of directors to express interest in a potential business combination.

27. On June 30, 2025, the Kenvue board unanimously agreed to establish a strategic review committee consisting of members of Kenvue's board to evaluate and review potential strategic alternatives.

28. On July 14, 2025, Kimberly-Clark made contact with representatives from Kenvue conveying Kimberly-Clark's preliminary interest in exploring a business combination with Kenvue. Additionally, representatives from PJT Partners, at Kimberly-Clark's direction, made contact with Kenvue's financial advisor Centerview Partners ("Centerview").

29. On August 25, 2025, after consulting with financial advisors and legal counsel, Kimberly-Clark's board agreed to proceed with the submission of an initial proposal for a strategic combination with Kenvue.

30. On August 28, 2025, Kenvue received Kimberly-Clark's preliminary, non-binding proposal (the "August 28 proposal") pursuant to which the shares of Kenvue common stock would be exchanged for 0.1475 shares of K-C common stock plus $6.00 in cash per share of Kenvue common stock.

31. From September 24 to October 14, 2025, representatives of Kenvue and Kimberly-Clark in conjunction with their respective financial and legal advisors held several meetings to review and discuss substantial business and operational data for each respective company.

32. On October 20, 2025, legal advisors delivered an initial draft of the merger

agreement for a potential business combination between Kenvue and Kimberly-Clark.

33.     On October 22, 2025, due to ongoing volatility of the market price of Kenvue common stock, the Kenvue board agreed to enter into a business combination pursuant to which shares of Kenvue common stock would be exchanged for 0.1475 K-C shares plus $4.00 in cash per Kenvue share.

34.     On October 31, 2025, representatives of Kimberly-Clark sent an updated proposal to Kenvue at 0.1450 shares of Kenvue, plus $3.00 in cash.

35.     In response, Kenvue made a counterproposal contemplating an exchange ratio of 0.14625 and $3.50 in cash.

36.     After exchanging information and other concerns, on November 2, 2025, the Kenvue board determined that the merger between Kimberly-Clark and Kenvue was in the best interest of stockholders and recommended that the deal be consummated.

**B.      The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement**

37.     On or about November 3, 2025, Kimberly-Clark and Kenvue issued a joint press release to announce the Proposed Transaction, stating in part:

**Kimberly-Clark to Acquire Kenvue, Creating a $32 Billion Global Health and Wellness Leader**

Nov 03, 2025 06:30 ET

DALLAS and SUMMIT, N.J., Nov. 3, 2025 /PRNewswire/ -- Kimberly-Clark Corporation (NASDAQ: KMB), a global personal care leader, and Kenvue Inc. (NYSE: KVUE), a global consumer health leader, today announced an agreement under which Kimberly-Clark will acquire all of the outstanding shares of Kenvue common stock in a cash and stock transaction that values Kenvue at an enterprise value of approximately $48.7 billion, based on the closing price of Kimberly-Clark common stock on October 31, 2025. The total consideration represents an acquisition multiple of approximately 14.3x Kenvue's LTM adjusted EBITDA[1] or 8.8x including expected run-rate synergies of $2.1 billion, net of reinvestment.

Transaction and Financial Details:

Under the terms of the agreement, which has been unanimously approved by each company's Board of Directors, Kenvue shareholders will receive $3.50 per share in cash as well as 0.14625 Kimberly-Clark shares for each Kenvue share held at closing, for a total consideration to Kenvue shareholders of $21.01 per share, based on the closing price of Kimberly-Clark shares as of October 31, 2025. Upon closing of the transaction, current Kimberly-Clark shareholders are expected to own approximately 54% and current Kenvue shareholders are expected to own approximately 46% of the combined company on a fully diluted basis.

As part of the transaction, Kimberly-Clark has received committed financing from JPMorgan Chase Bank, N.A. and intends to fund the cash component of the transaction consideration through a combination of cash from its balance sheet, proceeds from new debt issuance, and proceeds from the previously announced sale of a 51% interest in its International Family Care and Professional ("IFP") business.

The transaction is expected to close in the second half of 2026, subject to the receipt of Kenvue and Kimberly-Clark shareholder approvals, regulatory approvals and satisfaction of other customary closing conditions. As part of Kimberly-Clark's evaluation of this transaction, the Company carefully considered all risks and opportunities, working with some of the world's foremost scientific, regulatory, legal and other experts.

Leadership, Governance and Headquarters

Mike Hsu will be the Chairman and CEO of the combined company. At closing, three members of the Kenvue Board will join the Kimberly-Clark Board. The combined company will maintain Kimberly-Clark's headquarters in Irving, Texas and continue to have a significant presence in Kenvue's locations.

[***]

Advisors

PJT Partners LP and J.P. Morgan Securities LLC are serving as financial advisors to Kimberly-Clark, and Kirkland & Ellis LLP is serving as legal counsel. Gibson Dunn & Crutcher LLP and Arnold & Porter Kaye Scholer LLP are advising Kimberly-Clark on certain legal and healthcare regulatory matters. McKinsey & Company also advised Kimberly-Clark in this transaction.

Centerview Partners LLC and Goldman Sachs & Co. LLC are serving as financial advisors to Kenvue, and Cravath, Swaine & Moore LLP is serving as legal counsel.

Joele Frank, Wilkinson Brimmer Katcher is serving as strategic communications advisor to both companies.

38.     On or about December 4, 2025, in order to solicit approval to consummate the Proposed Transaction from Kenvue's public shareholders, the Board authorized the filing of the Registration Statement with the SEC.

39.     The Registration Statement is materially incomplete and misleading.

**C.     <u>The Materially Incomplete and Misleading Registration Statement</u>**

40.     The Registration Statement is materially incomplete and misleading with respect to (i) the potential conflicts of interest that Kenvue's financial advisors Goldman Sachs & Co. LLC ("Goldman Sachs") and Centerview Partners LLC ("Centerview") faced in the transaction, (ii) the actual terms of the Proposed Transaction, and (iii) the valuation analyses that Goldman Sachs and Centerview performed in connection with its opinion that the Proposed Transaction is fair from a financial point of view.

41.     *First*, the Registration Statement states that Goldman Sachs provided a fairness opinion with the respect to the Proposed Transaction. As such, the Company was obligated to fully and fairly disclose all potential conflicts of interest that Goldman Sachs faced in connection with the Transaction, including any material relationships that existed during the past two years between Goldman Sachs (or any of its affiliates) and any parties to the Proposed Transaction. *E.g., Baum v. Harman Int'l Indus.*, 408 F. Supp. 3d 70, 91 (D. Conn. 2019) ("[T]he failure to disclose even potential conflicts of interest may be actionable under federal securities law.") (quoting *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, No. 11-cv-222, 2012 U.S. Dist. LEXIS 36784, at *40 (D. Vt. Mar. 19, 2012)); Financial Industry Regulatory Authority ("Finra") Rule 5150; 17 C.F.R. § 229.1015; *cf. City of Dearborn Police & Fire Revised Ret. Sys. (Ch. 23) v. Brookfield Asset Mgmt.*, 314 A.3d 1108, 1132 (Del. 2024).

42.     Full and fair disclosure of conflicts of interest requires that a description of any compensation that had been received ***or remained to be received*** as a result of the relationships between Goldman Sachs and any of the parties to the Proposed Transaction during, at minimum, the past two years.  *See* 17 C.F.R. §§ 229.1015(b), 240.14a-3(a)(1), 240.14a-9, 240.14a-101 Item 14(b)(6).

43.     The Registration Statement purported to disclose the compensation that Goldman Sachs had received or stood to receive as a result of its relationships with Kimberly-Clark during the past two years by stating, in relevant part:

> Goldman Sachs and/or its affiliates have provided certain financial advisory and/or underwriting services to Kenvue and/or its affiliates from time to time for which Goldman Sachs Investment Banking has received, and may receive, compensation, including having acted as (i) a dealer in connection with a commercial paper issuance since March 2023, (ii) a lead book-running manager in connection with the offering of shares of Kenvue common stock in May 2024 and (iii) a book-running manager in connection with a public offering of Kenvue's notes in May 2025. During the two-year period ended November 2, 2025, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by Goldman Sachs Investment Banking to Kenvue and/or its affiliates of approximately $19 million. Goldman Sachs and/or its affiliates also have provided certain financial advisory and/or underwriting services to K-C and/or its affiliates from time to time for which Goldman Sachs Investment Banking has received, and may receive, compensation, including having acted as a financial adviser in connection with K-C's pending divestiture of its International Family Care and Professional segment, announced June 2025 and as a lender under K-C's existing revolving credit facility and is expected to be a lender under K-C's new revolving credit agreement. ***During the two-year period ended November 2, 2025, Goldman Sachs has not recognized any compensation for financial advisory and/or underwriting services provided by Goldman Sachs Investment Banking to K-C and/or its affiliates.*** As of November 2, 2025, Goldman Sachs Investment Banking was not (x) mandated by K-C and/or its relevant entities to provide financial advisory and/or underwriting services, except for the pending divestiture of its International Family Care and Professional segment, disclosed above or (y) soliciting K-C and/or its relevant entities to work on financial advisory and/or underwriting matters for any such persons on which it has not been mandated. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to Kenvue, K-C and their respective affiliates for which Goldman Sachs Investment Banking may receive compensation

Registration Statement at 115.

44.     The Registration Statement failed to actually ***describe the compensation*** that is to be received by Goldman Sachs in connection with its work on Kimberly-Clark's International Family Care and Professional ("IFP") segment.

45.     A company cannot conceal the amount of compensation that will be paid upon the closing of a pending transaction by describing the compensation that has been "recognized" but arbitrarily excluding the compensation that is "to be received."  *See* 17 C.F.R. § 229.1015(b)(4) ("Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received ***or to be received*** as a result of the relationship").

46.     *Second*, the Registration Statement fails to disclose the termination fee that Kenvue actually expects to recognize in the event Kimberly-Clark breaches the Merger Agreement, which is a material aspect of the Proposed Transaction.

47.     The Registration Statement indicates that one of the material factors that the Kenvue Board considered favoring the Proposed Transaction was "Kenvue's right to receive the termination fee of $1.136 billion, representing approximately 2.8% of Kenvue's fully diluted transaction equity value at signing, if the merger agreement is terminated under certain circumstances."  Registration Statement at 99.

48.     However, the Registration Statement also indicates that Goldman Sachs and Centerview "may" receive a portion of any termination fee that Kimberly-Clark might have to pay to Kenvue but not what portion of this fee would be paid and the circumstances under which the portion of the fee would be paid.

49.     Specifically, the Registration Statement states that "Centerview may also receive a fee from Kenvue in the event Kenvue receives a break-up, termination or similar fee from K-C in connection with the termination or non-completion of the mergers," and that "Goldman Sachs may

also receive a fee from Kenvue in the event Kenvue receives a break-up, termination or similar fee from K-C in connection with the termination or non-completion of the mergers."

Registration Statement at 109, 116.

50.     The Registration Statement omits the percentage of the termination fee that Goldman Sachs or Centerview may receive and thus fails to accurately disclose both the potential conflicts that these financial advisors faced and the amount of the termination fee that Kenvue will actually recognize in the event Kimberly-Clark breaches the Merger Agreement, which is clearly a material aspect of the Proposed Transaction that should also have been fully and fairly disclosed. Such information is material because not only do stockholders rely on the fairness opinions/analyses provided by financial advisors like Goldman Sachs and Centerview, but the Board itself recognized that the amount of the termination fee was an important factor supporting the Proposed Transaction.

51.     *Third*, the Registration Statement fails to disclose material information respecting the valuation analyses underlying Goldman Sachs' and Centerview's fairness opinions.

52.     The Registration Statement indicates that Goldman Sachs and Centerview's valuation analyses accounted for Kimberly-Clark's net debt.  However, the Registration Statement fails to disclose whether these net debt assumptions accounted for Kimberly-Clark's pending sale of 51% of its IFP segment, which remains pending at a purchase price of approximately *$1.7 billion*. *See* Registration Statement at 176.

53.     Indeed, Kimberly-Clark has prepared accounting statements that account for the impacts of the IFP segment but the Registration Statement fails to disclose whether Kenvue's financial advisors accounted for this divestment in performing their valuation analyses of Kimberly-Clark.

54.     Further, there is reason to suspect that the Registration Statement omits or misrepresents certain material information with respect to Centerview's *Comparable Companies Analysis*.

55.     The Registration Statement states, in part:

Based on its experience and professional judgment, for purposes of its analysis, for Kenvue, Centerview selected a reference range of multiples of enterprise value to estimated 2026 EBITDA of 12.0x to 14.0x (which is referred to as the "Kenvue EBITDA multiple reference range") and for K-C, Centerview selected a reference range of multiples of enterprise value to estimated 2026 EBITDA of 11.0x to 13.0x (which is referred to as the "K-C EBITDA multiple reference range"). In selecting these reference ranges, Centerview made qualitative judgments based on its experience and professional judgment concerning differences between the business, financial and operating characteristics of Kenvue, K-C and the selected comparison companies that could affect their public trading values in order to provide a context in which to consider the results of the quantitative analysis.

Centerview applied the K-C EBITDA multiple reference range to K-C's calendar year 2026 estimated EBITDA of $3,705 million as set forth in the Kenvue management adjusted K-C projections to derive a range of implied enterprise values for K-C. Centerview subtracted from this range of implied enterprise values the face value of K-C's net debt, less K-C equity investments, plus K-C non-controlling interests, in each case, as of September 30, 2025 as set forth in the K-C internal data to derive a range of implied equity values for K-C. Centerview then divided these implied equity values by the number of fully diluted outstanding shares of K-C common stock as of October 30, 2025, as set forth in the K-C internal data, to derive a range of implied per share equity values for K-C. Based on the estimated 2026 EBITDA of K-C, Centerview calculated a range of implied values per share of K-C common stock of $119.14 to $141.25.

Registration Statement at 106.

56.     The Registration Statement also indicates that Kimberly-Clark's financial advisors, J.P. Morgan and PJT Partners performed analogous analyses:

Using publicly available information, J.P. Morgan calculated, for each selected company, the FV/2026E Adjusted EBITDA (post-SBC).

Based on the results of this analysis, J.P. Morgan selected a FV/2026E Adjusted EBITDA (post-SBC) multiple reference range of 11.0x to 15.0x and applied that range to K-C's estimated adjusted EBITDA (post-SBC) for calendar year 2026 provided in the K-C standalone projections. This analysis indicated the following

range of implied equity value for K-C (rounded to the nearest $0.50), which was compared to K-C's closing share price of $119.71 as of the reference date.

| | Implied Equity Value Per Share of K-C Common Stock | |
|---|---|---|
| | Low | High |
| FV/2026E Adj. EBITDA (post-SBC) | $111.50 | $156.00 |

[…]

PJT Partners, based on its professional judgment, selected the K-C peers because PJT Partners believed their businesses and operating profiles are reasonably similar to those of K-C. However, because of the inherent differences between the businesses, operations and prospects of K-C and those of the K-C peers, PJT Partners believed that it was inappropriate to, and therefore did not, rely solely on the quantitative results of the selected comparable company analysis. Accordingly, PJT Partners also made qualitative judgments concerning differences between the businesses, financial and operating characteristics and prospects of K-C and the K-C peers that could affect the public trading values of each in order to provide a context in which to consider the results of the quantitative analysis. These qualitative judgments related primarily to the differing sizes, growth prospects, profitability levels and degree of operational risk between K-C and the K-C peers.

Accordingly, PJT Partners selected a TEV/2026E adjusted EBITDA (post-SBC) multiple range of 12.0x to 16.0x and applied such range to K-C's estimated adjusted EBITDA (post-SBC) for the fiscal year ending December 31, 2026 included in the K-C standalone projections, to calculate a range of implied prices per share of K-C common stock based on the fully diluted shares of K-C common stock outstanding calculated using the treasury stock method as of October 30, 2025 as well as K-C's estimated net debt, non-controlling interests, investments in associates and JVs and unfunded pension expense, in each case, as of December 31, 2025 based on the K-C standalone projections and information provided by K-C management. The following summarizes the results of these calculations:

| | Implied prices per share of K-C common stock |
|---|---|
| TEV/2026E Adjusted EBITDA (Post-SBC) | $122.50 – $167.00 |

Registration Statement at 83, 94.

57.     Although the Registration Statement does not expressly state the 2026E adjusted EBITDA (post-SBC) amount that J.P. Morgan and PJT Partners used in connection with their analyses, the Registration Statement elsewhere indicates that Kimberly-Clark's 2026E projected

adjusted EBITDA was $3,705 million, further states that adjusted EBITDA is a non-GAAP financial measure that is derived from "earnings before interest, taxes, depreciation, and amortization, ***further adjusted for restructuring expenses***."  Registration Statement at 119.

58.     In contrast, the Registration Statement indicates that ***Kenvue's*** 2026E Adjusted EBITDA of $3,565 million was derived from Kenvue's U.S. GAAP Net income, and adjusted to account for, among other things conversion of stock-based awards and stock-based awards granted to individuals employed by Kenvue.  Registration Statement at 119.

59.     Thus, it appears that Kimberly-Clark's 2026E adjusted EBITDA already accounts for stock-based compensation as a cash expense, and thus, the 2026E adjusted EBITDA (post-SBC) was $3,705 million.

60.     Further, "back of the envelope" calculations also appear to confirm that PJT Partners and J.P. Morgan performed their analyses by applying their selected multiples ranges, 11.0x to 15.0x and 12.0x to 16.0x, respectively, to a 2026E adjusted EBITDA of $3,705 million, accounted for $4,337 million in cash, $834 million in short-term debt, $6,470 million in long-term debt, and then dividing the aggregate equity value by a fully diluted share-count of approximately 338 million, consistent with the pro forma balance sheet information at p. 177 of the Registration Statement and the Kimberly-Clark capitalization information in the Section 5.02(a) of the Merger Agreement.  The valuation ranges in the Registration Statement are generally consistent with the results of this "back of the envelope" math:

**JPM**

| Metric | Metric | Multiple | EntVal | Cash | Debt | Eq Val | FDSO | EqVal/Sh | Proxy Range | Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| KC 2026E Adj EBITDA | 3705 | 11 | 40755 | 4337 | 7304 | 37788 | 338 | 111.80 | 111.50 | -0.27% |
| KC 2026E Adj EBITDA | 3705 | 15 | 55575 | 4337 | 7304 | 52608 | 338 | 155.64 | 156.00 | 0.23% |

**PJT**

| Metric | Metric | Multiple | EntVal | Cash | Debt | Eq Val | FDSO | EqVal/Sh | Proxy Range | Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| KC 2026E Adj EBITDA | 3705 | 12 | 44460 | 4337 | 7304 | 41493 | 338 | 122.76 | 122.50 | -0.21% |
| KC 2026E Adj EBITDA | 3705 | 16 | 59280 | 4337 | 7304 | 56313 | 338 | 166.61 | 167.00 | 0.24% |

61.     However, the results of this same "back of the envelope" math are not consistent with the results that the Registration Statement provides for Centerview's analysis:

**CENTERVIEW**

| Metric | Metric | Multiple | Ent Val | Cash | Debt | Eq Val | FDSO | EqVal/Sh | Proxy Range | Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| KC 2026E Adj EBITDA | 3705 | 11 | 40755 | 4337 | 7304 | 37788 | 338 | 111.80 | 119.14 | 6.57% |
| KC 2026E Adj EBITDA | 3705 | 13 | 48165 | 4337 | 7304 | 45198 | 338 | 133.72 | 141.25 | 5.63% |

62.     Indeed, although it appears that the low-end assumptions for J.P. Morgan and Centerview should have resulted in the same implied valuation, the Registration Statement indicates that Centerview's low-end valuation for Kimberly-Clark was almost 7% higher than J.P. Morgan's low-end valuation for Kimberly-Clark.

63.     Thus, the Registration Statement omits material information about the assumptions underlying the valuation analyses that the financial advisors to the Proposed Transaction performed.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

48.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

49.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

53. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.

The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

56.     The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

57.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of the Company within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

62. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63. By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

of the Exchange Act.

64. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

20

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 8, 2025

**ADEMI & FRUCHTER LLP**

By: *_/s/ John D. Blythin_*
John D. Blythin
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jfruchter@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*